## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| ALAN SPIVAK | ) | |
| Individually and on behalf of a class of | ) | CASE NO.: 1:15-cv-178 |
| similarly situated persons, | ) | |
| | ) | JUDGE: |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CLASS ACTION COMPLAINT |
| | ) | |
| | ) | JURY TRIAL DEMANDED |
| LUMBER LIQUIDATORS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## CLASS ACTION COMPLAINT

Plaintiff Alan Spivak, by and through his undersigned counsel, on behalf of himself and all other persons similarly situated, alleges the following facts and claims upon knowledge as to matters relating to himself and upon information and belief as to all other matters, as follows:

## INTRODUCTION AND SUMMARY OF ACTION

1.      Plaintiff brings this class action on behalf of himself and the members of the below-defined Class and Subclass against Lumber Liquidators.  In this capacity, Plaintiff seeks to obtain damages, as well as injunctive and equitable relief arising from, and relating to, his purchase and installation of Lumber Liquidators' wood flooring materials ("Flooring Products").

2.      Defendant Lumber Liquidators ("Defendant," the "Company," or "Lumber Liquidators") manufactured, imported into the United States, and falsely warranted, advertised, and sold Flooring Products to tens of thousands of consumers throughout the United States, including at least thousands in Ohio.  The Flooring Products breach express and implied warranties and are contrary to the qualities and characteristics that have been represented.

3.     In particular, in contravention of its direct representations, Lumber Liquidators manufactures, sells, and distributes Flooring Products that emits and "off-gasses" excessive levels of formaldehyde, which is categorized as a known human carcinogen by the United States National Toxicology Program and the International Agency for Research on Cancer.

4.     Contrary to Lumber Liquidators' repeated, detailed representations on its product labels, website, and elsewhere, that its flooring complies with strict formaldehyde standards, the toxic formaldehyde emissions from the Company's Flooring Products are in fact multiple times the maximum permissible limits set by those standards at the time of purchase.

5.     Defendant's misconduct with respect to its manufacturing, marketing, and sale of Flooring Products has caused Plaintiff and the other Class members to suffer direct financial harm.  To be clear, Plaintiff does not assert claims in this action for personal injuries caused by formaldehyde exposure. Rather, Plaintiff alleges that the Flooring Products are markedly less valuable because they do not conform to Defendant's warranties and contain elevated levels of formaldehyde.  Plaintiff would have paid significantly less, assuming he had purchased Flooring Products at all, had he known that the products contained elevated levels of the toxin formaldehyde.

6.     Defendant's misconduct can also cause damage to other property in the homes of Plaintiff and other Class members.  Formaldehyde is known to cause premature and progressive degradation of coils used in their heating, ventilation, and air conditioning ("HVAC") systems, which can lead to HVAC failure.

7.     Plaintiff further asserts claims individually and on behalf of the other members of the proposed Class and Subclass for violations of the Magnuson-Moss Warranty Act; Ohio

Consumer Sales Practices Act; Ohio Deceptive Trade Practices Act; breach of express and implied warranty; negligent design/engineering/manufacturing; strict liability – failure to warn; negligence; fraud; and unjust enrichment arising from Defendant's manufacture, importation, advertisement, and selling of the Flooring Products at issue here.

## II. JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).  The aggregated claims of the individual Class members exceed the sum or value of $5,000,000, exclusive of interests and costs, and this is a case in which at least one Plaintiff or Class member is a citizen of a different state than the Defendant.

9.      This Court has jurisdiction over Lumber Liquidators because the Defendant transacts business in Ohio, advertises and markets its products in Ohio, disseminated the representations and deceptions throughout Ohio, and derives a substantial income from the sale of products in Ohio giving rise to personal jurisdiction over Defendant.

10.     Venue is proper in this District under 28 U.S.C. § 1391 (a)-(d) because, among other things, substantial parts of the events or omissions giving rise to the claim occurred in the District and/or a substantial part of property that is the subject of the action is situated in the District.

## III. PARTIES

11.     Alan Spivak is, and at all relevant times has been, a resident and citizen of Ohio. In or about May 2013, Mr. Spivak purchased Dream Home St. James Chimney Rock Charcoal Laminate Flooring directly from Defendant, which was installed in his home.  This flooring was manufactured in China.  At the time of purchase, Lumber Liquidators falsely represented and

warranted the flooring to comply with strict formaldehyde standards. Plaintiff would not have purchased the Flooring Products had he known that the Flooring Products flouted, rather than complied with, strict formaldehyde standards.

12. Lumber Liquidators, Inc. is a Delaware corporation with its principal executive offices located at 3000 John Deere Road, Toano, Virginia 23168. Lumber Liquidators is one of the largest specialty retailers of hardwood flooring in the United States. The Company sells primarily to homeowners directly or to contractors acting on behalf of homeowners through its network of approximately 300 retail stores in 46 states. The Company also provides customer sales over the Internet, which are then shipped to a retail store for pickup.

13. Lumber Liquidators has mills in, and buys many of its source wood flooring material from, China. In 2011, Lumber Liquidators acquired another company's assets related to quality control and assurance, product development, and logistics operations in China. In connection with the transaction, the Company established a representative office in Shanghai, China and assumed "direct control" of all of its product sourcing in China (through its headquarters in China).

14. With its acquisition, Lumber Liquidators began eliminating distributor middlemen and establishing a "fully direct relationship" with the mills in China.

15. Lumber Liquidators also began "line reviews" in which it pitted suppliers against each other to bid for Defendant's business, increasing/consolidating business with mills and manufacturers that could provide the lowest price and eliminating relationships with others. Many of the vendors that had the lowest prices were Chinese mills. Defendant was able to get "very significant cost concessions from these vendors." As a result, Lumber Liquidators began

4

shifting more of its sourcing to Chinese mills, many of which the Company had never worked with before. In 2011, the Company's top 10 suppliers accounted for approximately 70% of the Company's supply purchases. Approximately 42% of the Company's product was sourced from China. That figure increased to 50% in 2013.

16.     In its 2012 Annual Report filed with the Securities and Exchange Commission on Form 10-K on February 20, 2013, Lumber Liquidators' parent company, Lumber Liquidators Holdings, Inc., admitted that its "experience with the legal and regulatory practices and requirements in China is **limited**." (emphasis added).

## IV.  <u>FACTUAL BACKGROUND</u>

17.     Lumber Liquidators sells primarily to homeowners directly or to contractors acting on behalf of homeowners through its network of approximately 352 retail stores in 46 states.  Consumers may also purchase the Company's products online, and any purchases made over the Internet are shipped to the Lumber Liquidators' retail location of the customers' choosing.

18.     Lumber Liquidators began in 1993 when Tom Sullivan, a building contractor, began purchasing excess wood and reselling it from the back of a trucking yard in Stoughton, Massachusetts.  The Company eventually focused on hardwood flooring.  The Company's first store opened on January 5, 1996 in West Roxbury, Massachusetts.  Eight months later, a second store opened in Hartford, Connecticut, and from there the Company expanded exponentially.

19.     The Company moved headquarters from Boston, Massachusetts to Colonial Heights, Virginia in 1999.  In 2004, the Company moved its headquarters to its current location, a 306,000 square foot production center in Toano, Virginia.

20.     Lumber Liquidators prides itself on having one of the largest inventories of prefinished and unfinished hardwood floors in the industry.  Lumber Liquidators carries solid and engineered hardwood, laminate flooring, bamboo flooring, cork flooring and resilient vinyl flooring, butcher blocks, molding, accessories, and tools.

21.     Lumber Liquidators represents that it negotiates directly with the lumber mills, eliminating the middleman and passing the savings on to its customers.  The Company also represents and warrants that it is "environmentally conscientious."

22.     As of December 31, 2014, Lumber Liquidators had 1,891 employees and net sales of over $1 billion.

23.     Unfortunately, one of the primary reasons Lumber Liquidators has grown so quickly and its profits have surged has been through the Company's misrepresentations about the formaldehyde levels of its products and through its sourcing of cheap lumber from China.

24.     Moreover, given its admitted "limited" understanding of the legal and regulatory practices in China, it is not surprising that Defendant's Flooring Products fail to comply with Lumber Liquidators' representations about these products.

25.      Contrary to its representations to Plaintiff and the other Class members, Lumber Liquidators has knowingly and intentionally sourced, manufactured, sold, and distributed falsely advertised Flooring Products that emit excessively high levels of formaldehyde.

26.     Formaldehyde ($CH_2O$) is a naturally occurring chemical that can be synthesized and used in certain industrial processes.

27.     Formaldehyde is classified as a volatile organic compound ("VOC"), which is a chemical that becomes a gas at room temperature.  It is listed as a known human carcinogen by

the National Toxicology Program and the International Agency for Research on Cancer and is associated with myriad other adverse medical conditions even in short term exposure, including asthma and rheumatoid arthritis.

28.     According to the U.S. Occupational Safety & Health Administration ("OSHA"):

> The concentration of formaldehyde that is immediately dangerous to life and health is 100 ppm. Concentrations above 50 ppm can cause severe pulmonary reactions within minutes. These include pulmonary edema, pneumonia, and bronchial irritation which can result in death. Concentrations above 5 ppm readily cause lower airway irritation characterized by cough, chest tightness and wheezing.
>
> Long term exposure has been linked to an increased risk of cancer of the nose and accessory sinuses, nasopharyngeal and oropharyngeal cancer, and lung cancer in humans.[1]

29.     Formaldehyde has a pungent odor and irritates the respiratory tract. The most common symptoms of formaldehyde exposure are burning eyes, nose and throat irritation, coughing, headaches, dizziness, joint pain, and nausea. Due to the harmful effects of formaldehyde on human health, various laws have been enacted to reduce consumers' exposure to this toxin.

30.     When present in homes, excess levels of formaldehyde are also known to cause premature and progressive degradation of coils used in HVAC units, culminating in failure. In homes, the formaldehyde converts to formic acid and then formates in moisture. This compound acts as a degradation mechanism, leaving behind a corrosion footprint visible under a microscope, though not to the naked eye.[2]

---

[1] Occupational Safety & Health Administration, Standard 1910.1048 App. C (Medical surveillance – Formaldehyde), https://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=standards&p_id=10078

[2] *See, e.g.,* Carrier, "Industry Research Report: Indoor Coil Corrosion," available at http://www.hydro-temp.com/help/drawings/Formicary_Corrosion.pdf and the citations contained therein.

31.     Wood flooring can contain formaldehyde because formaldehyde is often used in the adhesives and resins used to make engineered wood floors.  Formaldehyde can be released into the air (through a process called "off-gassing") from wood flooring materials.

32.     According to the Consumer Product Safety Commission ("CPSC"), pressed-wood (*i.e.*, hardwood plywood, particleboard, and medium-density fiberboard ("MDF")) and wood-based products, especially those containing urea-formaldehyde (or "UF") resins, may be "a significant formaldehyde source."

33.     Many, if not all, of Lumber Liquidators' Flooring Products contain UF/urea-formaldehyde or other formaldehyde resins.  For example, the Material Safety Data Sheet for Lumber Liquidators' Morning Star Bamboo Flooring states:  "This product is composed of bamboo fibers bonded together with urea formaldehyde (UF) resins."  UF makes up 10-11% of the product.

34.     Chinese-sourced wood products (including Lumber Liquidators' Flooring Products) are particularly associated with excess formaldehyde levels.

35.     For example, in February 2012, the leading Chinese hardwood flooring company, Anxin Weiguang Flooring, was forced to pull its wood flooring products from shelves pending an investigation by Shanghai's Bureau of Supervision, Inspection and Quarantine because of claims that the flooring emitted excessive levels of formaldehyde.

36.     One study, entitled "Formaldehyde in China: Production, consumption, exposure levels, and health effects," *Environment International* 35 (2009) 1210–1224, found that over the last 20 years, China's formaldehyde industry has experienced unprecedented growth, and now produces and consumes ***one-third*** of the world's formaldehyde.  More than 65% of the Chinese

formaldehyde output is used to produce resins which are mainly found in wood products. These are also the major source of indoor air pollution in China. The study documented numerous instances of hazardous occupational exposure to formaldehyde in Chinese wood workers.

37. Chinese regulations governing formaldehyde in wood products are weak. As a result, wood sourced from China is not subject to the strict environmental regulations that would govern such wood products manufactured in the United States.

38. The California Air Resources Board ("CARB") is a department of the California Environmental Protection Agency. CARB's mission is to promote and protect public health, welfare, and ecological resources through effective reduction of air pollutants while recognizing and considering effects on the economy. CARB oversees all air pollution control efforts in California to attain and maintain health-based air quality standards. Additionally, CARB mandates are typically the model for national standards. For example, the Environmental Protection Agency and the Department of Transportation coordinated their most recent round of proposed rules with CARB. CARB has served as the model for the federal standard in formaldehyde emissions as well.

39. CARB promulgated the Airborne Toxic Control Measure to Reduce Formaldehyde Emissions from Composite Wood Products, California Code of Regulations, Title 17, §§ 93120-93120.12 (the "CARB Regulations"), in January 2009. The CARB Regulations apply to a range of composite wood products, including flooring, hardwood plywood, particleboard and fiberboard. The CARB regulations (phase 2) dictate that certain wood products sold in the State of California must emit no more than 0.05 parts per million of formaldehyde as determined per relevant testing methods.

40.     The United States statute that governs permissible formaldehyde emissions, the Formaldehyde Standards for Composite Wood Products Act of 2010, 15 U.S.C. § 2697 (the "Formaldehyde Standards Act"), was signed into law on July 7, 2010.  The Formaldehyde Standards Act adopted the standards established by CARB as a nationwide standard.

41.     Lumber Liquidators' marketing materials, including the Company's website, specifically represent to consumers that the Company's Flooring Products comply with the formaldehyde emission regulations propounded by CARB and, indeed, comply with even stricter European Union ("EU") formaldehyde standards:

> ***All laminates and engineered flooring products sold by Lumber Liquidators are purchased from mills whose production method has been certified by a Third Party Certifier approved by the State of California to meet the CARB standards.*** The scope of the certification by the Third Party Certifier includes the confirmation that the manufacturer has implemented the quality systems, process controls, and testing procedures outlined by CARB and that their products conform to the specified formaldehyde emission limits.  The Third Party Certifier also provides ongoing oversight to validate the manufacturers' compliance and manufacturers must be periodically re-certified.

> Though it currently applies only to products sold in California, ***Lumber Liquidators made a decision to require all of our suppliers to comply with CARB regardless of whether we intended to sell the products in California or any other state/country.  In addition, our suppliers manufacture their products in accordance with the European standard which has stricter guidelines than the California*** [sic].

> In addition to the CARB requirements, ***Lumber Liquidators regularly selects one or more products from each of its suppliers and submits them for independent third-party lab testing.*** This is done as a monitoring activity to validate ongoing compliance.[3] (Emphasis Added).

42.     In addition, Defendant represents and warrants that its Flooring Products comply with CARB Phase 2 Formaldehyde standards on the product packaging:

---

[3] http://www.lumberliquidators.com/ll/flooring/Flooring101-formaldehyde-what-is-it

*Illustration #1:*



*Illustration #2*:



43. Similarly, Lumber Liquidators' "technical specifications" materials for both its

Morning Star Bamboo and Virginia Mill Works products represent that its Flooring Products has

"very low formaldehyde release" that "meets MR/E1" (European formaldehyde standards).

11

44. Lumber Liquidators' website also represents to consumers that the company requires its suppliers to follow a "Supplier Code of Conduct with Respect to Environmental and Social Responsibility," and "represent and warrant that they are in full compliance with all applicable laws and regulations[.]"[4]

45. In addition, each of Lumber Liquidators' products is covered by a warranty stating that the flooring will be free from defects. For example, the Mayflower Engineered Limited Warranty states that: "**Mayflower engineered prefinished hardwood floors are crafted to meet the industry's highest quality standards and are carefully manufactured to ensure they are free of defects. Each board is meticulously inspected before and after the finishing process to make sure it complies with Mayflower's unwavering standards**." (emphasis added). Each of the warranties at issue here contains the same, or substantially similar, statements representing that the products are "free of defects."

46. Contrary to Lumber Liquidators' repeated, detailed representations and warranties, however, its Flooring Products off-gas formaldehyde at the time of purchase at levels that far exceed the standards propounded by CARB and the EU resulting in harm to Plaintiff and the other Class members who purchased these products.

47. The truth regarding Lumber Liquidators' flooring began to emerge on June 20, 2013, when blogger Xuhua Zhou ("Zhou") reported on the website *Seeking Alpha* the results of his independent investigation of the formaldehyde levels present in Lumber Liquidators' flooring.

---

[4] http://www.lumberliquidators.com/assets/images/product_page/California_Supply_Chains_Act.pdf

48. Mr. Zhou sent off samples of Lumber Liquidators' Flooring Products to be tested.[5] Two separate and independent accredited testing laboratories confirmed that the Flooring Products manufactured, distributed, and sold by Lumber Liquidators emitted and off-gassed formaldehyde at levels **far exceeding** the CARB (and EU) formaldehyde limits.

49. As Zhou explained:

I recently conducted independent lab testing - engaging Berkeley Analytical, an IAS accredited testing laboratory - on a sample of Lumber Liquidators house brand flooring ("Mayflower" brand), and the results that came back weren't pretty: **Over 3.5x the maximum legal level for formaldehyde**. (This product was purchased retail from a Southern California retail store.) Fully understanding the importance of this finding, we submitted samples from the same package to a second laboratory, this one the "gold standard" lab for the National Wood Flooring Association, NTA. **This second lab confirms the product is in violation of the legal limit for formaldehyde**.

* * *

The tested product, Mayflower 5/16" x 5" Bund Birch Engineered, emits a staggering three and half times over the government mandated maximum emission level. The product is clearly not CARB compliant yet Lumber Liquidators tagged CARB compliance on the box. (emphasis added).

50. Rather than respond to or acknowledge the testing results, Lumber Liquidators initiated a clearance sale to offload its existing inventories on consumers. As Zhou explained in a follow-up article dated June 24, 2013:

Despite having offered to send the company my noncompliant sample and the relevant lab reports, I have yet to correspond with anyone from Lumber Liquidators. Instead, *Lumber Liquidators initiated an End of Quarter CLEARANCE sale for all its flooring products per a marketing email received this Sunday. The company chose not to follow up on credible questions raised about its product safety and instead launched a marketing sales campaign to get rid of existing inventory faster.* It could be that Lumber Liquidators management needs to make analyst projections for the second quarter or it may be trying to unload all noncompliant inventories before the California Air Resource Board starts to crack down on the issue. Regardless of the rationale, it is hardly a

---

[5] Zhou disclosed that he held short positions in the Company's stock at the time of his report.

responsible decision on the part of Lumber Liquidators.[6] (emphasis added).

51.     Zhou also preserved his Flooring Products and directly asked Lumber Liquidators to contact him and conduct its own testing. Although the Company was undoubtedly aware of his request given the widespread publicity his report received, Lumber Liquidators never followed up with him to request his results.

52.     Additional third-party testing has corroborated the finding that Lumber Liquidators' Flooring Products contain unacceptably high levels of formaldehyde. A non-profit environmental organization and a public health organization in California made similar findings. They tested forty boxes of the Flooring Products and found that the Flooring Products contained very high levels of formaldehyde. They emitted at 350% the rate of European/North American products and average exposures at the time of testing were over 100 times above the CARB thresholds.

53.     Testing by CBS News' investigative reporters revealed similar findings. Investigators purchased 31 boxes of the Flooring Products from stores in Virginia, Florida, Illinois, and New York and sent the samples for testing at two certified labs. Thirty of the thirty one samples were non-compliant with CARB standards with some thirteen times over the California limit.

54.     CBS News' investigators also traveled to China, visiting three different mills that manufacture the Flooring Products. Employees at the mills openly admitted that they use core boards with higher levels of formaldehyde to make Lumber Liquidators' laminates. At all three mills they also admitted falsely labeling the company's laminate flooring as CARB-compliant.

---

[6] Xuhua Zhou, *Lumber Liquidators – Management's Silence and Broker's Rebuttal May Validate Worst Fear*, Seeking Alpha, available at http://seekingalpha.com/article/1517322-lumber-liquidators-managements-silence-and-brokers-rebuttal-may-validate-the-worst-fear. (emphasis added)

55.     These findings are similar to the experiences of Plaintiff and other purchasers of Lumber Liquidators' Flooring Products.  A sampling of message board forums for homeowners and builders reveals that several other purchasers have also raised formaldehyde concerns about Defendant's wood flooring products:[7]

56.     Sandra of Vienna, VA on May 30, 2013:

Recently, I had bamboo flooring from Lumber Liquidator installed on Memorial Day, 27th May 2013. The flooring is carbonized strand bamboo, 500 sq. ft. installed. I noticed the odor as the installation took place and found it quite peculiar. I chalked it up as a new product odor especially since the planks just came out of the boxes. Within the next 48 hours I realized it was not a temporary odor. I have burning nostrils; my face feels like it is stinging, and I'm having a dull headache. Yet, when I leave the house, the above symptoms disappear.

The smell has permeated the house and the odor is noxious. I had to close the intake air conditioner vent in that room.  I believe the bamboo wood has a high level of formaldehyde. What is LL's past experience in dealing with customers who are allergic to the emitted toxic fumes from the wood?  Do they refund/replace the wood? Are the formaldehyde levels carcinogenic? What is the bottom line from LL for assisting their customers who become sick from bamboo they import from China???  How informed are consumers about the constant emission of toxic fumes from LL wooden floor?  What is LL doing about the problem?  Do they care or they are only concerned with their bottom line... the Almighty Dollar?  Class action lawsuit anyone???[8]

57.     Bethany of New York city wrote on the Consumer Affairs website on July 27, 2013:

Formaldehyde in bamboo flooring - There is a class action lawsuit against this company.  I noticed my eyes burning whenever I was in the room where the flooring had been placed. Just today I started looking into it, wondering if I was allergic to bamboo!  Lumber Liquidators has been informed on the high level of toxins and responded by having a massive sale. Their stock has plummeted. They need to issue a recall but in the meantime no one will talk to me.[9]

---

[7] All quotes have been reproduced directly as written in their respective publications, without the delineation of [*sic*] for any specific typographical, spelling, or syntax error.

[8] http://www.consumeraffairs.com/homeowners/lumber_liquidators.html

[9] http://www.consumeraffairs.com/homeowners/lumber_liquidators.html?page=3

58.     A similar post by "rg100" on March 25, 2012 at 2:06 states:

I purchased morning star bamboo strand click flooring from Lumber Liquidators. Little did I know that it would release a bad acidic odor which will not go away, it actually made me sick.  I paid someone to install it and now i have to take the flooring out and LL wont give a full refund and is charging 20% restock fee. After researching i found out that LL is aware of the problem and does not disclose it to consumers who are purchasing the product.[10]

59.     Lumber Liquidators responded to rg100's March 25, 2012 post above, stating that once a consumer installed Lumber Liquidators' Flooring Products, they were left with no recourse.  Posted by "Directorcustcare444" on March 31, 2012 at 9:28:

We're sorry to hear you're dissatisfied.  No matter where you source bamboo, some items may need to "gas off" as other postings note.  The process simply means the packaged material once unpackaged and allowed to adjust to the rooms temperature and humidity will begin to normalize and the scent will dissipate. Installed material is deemed accepted and the problem you shared is not one common as a concern raised by consumers.  We sell thousands of sq ft of this material each week and would be flooded with this type of concern if it was truly a broader issue.  The care instructions are as follows: HANDLE WITH CARE To prevent board warping or bowing; do not cut the packaging plastic support bindings until ready to install.  Do not stand flooring on ends or sides. Do not store directly on bare concrete or next to outside walls. Cartons should be placed as close to the center of the installation area as possible.  Store flat supporting to the ends and center sections.  Store in a dry place being sure to provide air flow under and around cartons.  Keep out of direct sunlight and away from air vents. You regulation of interior conditions may be a contributing factor.  All wood items have their own "smells" and if this was an issue it would be known as the product was removed from the box and the invoice states we will take product back. Fully installed material is accepted, so you failed to follow these instructions and we regret this ended up leaving you dissatisfied. **This case highlights the importance of reading and following these detailed instructions**.[11] (emphasis added).

60.     Flabbergasted by Lumber Liquidators' response,  "rg100" responded on April 4, 2012 at 11:26 by stating:

---

[10] http://ths.gardenweb.com/forums/load/flooring/msg0302064114023.html
[11] *Id.*

16

are you kiding me with your post directorcustcare444?? The instructions were followed, and you tell me that its my fault your bamboo product outgases formaldehyde?? Which is defined as "A gas at room temperature, formaldehyde is colorless and has a characteristic pungent, irritating odor etc...In view of its widespread use, toxicity and volatility, exposure to formaldehyde is a significant consideration for human health.… On 10 June 2011, the US National Toxicology Program has described formaldehyde as "known to be a human carcinogen". Is all of this in your instructions that you say i didnt follow? Does it say in your instructions that formaldehyde, a carcinogen, will be released into your home, but according to you its ok because it will eventually go away?[12]

61.     As shown in the Company's response, it was of the utmost importance to read the warranty at the time of purchase and installation, and the warranty contained explicit representations that the Flooring Products did not violate the Lacey Act, nor did it off-gas formaldehyde in violation of CARB standards.

62.     Other purchasers of the Company's products experienced similar problems with their flooring, and were also unsuccessful in receiving the clear protections set forth in the Lumber Liquidators warranty.  Posted by "odinfang" on Jan. 6, 2013 at 17:35:

my husband and I also purchased this bamboo flooring in Sept 2012....not only is it seperating EVERYWHERE....but the odor is also making my husband and I sick!!!!!!!!!!!!!!!!!!we paid $325 to have an inspector come out and we are getting ready to take legal action....our attorney is reviewing all our documents as we speak.....I could not believe it today when I found all the rest of you poor people that are also suffering.  It makes me sooo upset that LL has known about the problem since at least 2006 and they are till getting away with selling it!!! Lets do something about this.....[13]

63.     Moreover, "Customer" posted in or about August 2013:

smell from laminate flooring

I bought 466 square feet of laminate flooring for over $1000 and am not able to install it because of the overwhelming toxic fumes it produces. I kept it for weeks in a spare room hoping it would out gas on its own but now the whole house stinks. I have to throw it out before we become ill. They have to know these

---

[12] *Id.*
[13] *Id.*

17

products made in China have way too much formaldehyde in them. I would never buy from them again.[14]

64.     Similarly, "Employee" posted in or about August 2013:

Ripof company.  We will never honor our warranty. The consumer is basically screwed[15]

65.     Thereafter, "smithmiller6" posted on April 3, 2010 at 1:29 pm as follows:

Sick of bamboo floor fumes problem

If one has installed a bamboo floor and had trouble with fumes? We purchased Morning Star Bamboo from Lumber Liquidators and installed it in a bedroom. We had planned to do the whole second floor with it but had installation delays--luckily! We noticed a strange, acrid odor right after installation.  We weren't using the room much, though, so it wasn't a problem.  We just left the window open for a few days, thinking that would take care of it.  Well, a couple months later we moved in and the fumes were AWFUL--I mean, make your eyes tear and your nose burn awful.  For the past month we have been venting the room with a fan to the outside, but it doesn't seem to be doing much good. We've been sleeping in this room and if we can't ventilate it for at least ten hours first (and we often can't now that the weather is getting so cold) then I wake up with a burning nose and a headache and my husband's eyes swell up. This product supposedly meets "more stringent" European emission standards, but it is definitely causing a health issue for us--perhaps not for folks who don't have allergies or sensitivities or whatever, but for us it is a big problem.  LL will not take what's left back. I'm wondering if anyone else has had similar problems with bamboo products and whether they've been able to mitigate it. I don't really want to continue with the installation, but if LL continues to balk at taking it back, we're not sure what we'll do...looking into other flooring options, but if we're saddled with this bamboo, we may not have $$ left over to do anything with this floor and may have to do what we can with ventilating whenever we can! If this is a known health issue with these floors, though, and not "just us" (I do have a type of migraine that makes me sensitive to chemicals) then we want to push LL both to take this stuff back and to stop selling it![16]

66.     "Tommy," on January 6, 2011, posted:

We bought 1600sf Bellawood floor from Lumber Liquidators and installed it in our house. Right after the installation, my family started suffering irritated eyes, skin rash, and burning throat, respiratory stress. Indoor air testing showed the

---

[14] http://www.hallway.com/companies/lumber-liquidators-inc-employee-reviews?nt=16382&page=1
[15] *Id.*
[16] http://www.plumbingforums.com/forum/f4/sick-bamboo-floor-fumes-problem-415/

formaldehyde level was above 0.2ppm, which is 25 time higher than the normal level (0.008ppm). We have to move to other place to avoid exposure. The Lumber Liquidators and their insurance company Liberty Mutual kicked the ball back and forth, and made us a homeless for 8 months. I would like to tell other customers of Lumber Liquidators, if you are suffering some respirotary symptoms, check the Formaldehyde level in your house. If you are going to buy products from Lumber Liquidator, please think about my experience.[17]

67.     The foregoing complaints are representative of the experiences and views of consumers purchasing product from Lumber Liquidators and represent a small fraction of purchaser complaints.

68.     Unsurprisingly, 60 percent of reviews at Consumer Affairs, a leading consumer news and advocacy organization, give Lumber Liquidators an "Overall Satisfaction Rating" of just one out of five stars, based on 286 customer reviews.[18]

69.     It is beyond reasonable dispute that Lumber Liquidators knew of many of these posted customer complaints.  For example, as noted above, the Company actually responded to at least one of the complaints and specifically told customers "**the importance of reading and following . . . these detailed instructions**," which are included with the false representations regarding the Company's compliance with CARB and EU formaldehyde standards. (emphasis added).

70.     Nevertheless, Lumber Liquidators continued to misrepresent that its Flooring Products were CARB and EU compliant when it knew that this was false, downplayed the formaldehyde off-gassing defect of its Chinese wood products, and failed to properly investigate and inform customers regarding the formaldehyde emissions problems associated with its products.

---

[17] http://www.complaintsboard.com/complaints/lumber-liquidators-c407349.html
[18] http://www.consumeraffairs.com/homeowners/lumber_liquidators.html

71.     Further, Lumber Liquidators continues to purchase from Chinese manufacturers and import into the United States cheap, non-compliant flooring and falsely advertise that the flooring complies with state, federal, and international standards.

72.     Had Defendant adequately and fairly represented its products, Plaintiff and the other Class members would not have purchased these products and/or would have paid less money for them.

## V. CLASS ACTION ALLEGATIONS

73.     Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, individually and on behalf of a class defined as:

> All persons in the United States (including its Territories and the District of Columbia) who purchased wood flooring from Lumber Liquidators, Inc., either directly or through an agent, that was sourced, processed, or manufactured in China. (the "Class").   Excluded from the Class is Lumber Liquidators, its affiliates, employees, officers and directors, persons or entities that distribute or sell Lumber Liquidators flooring, the Judge(s) assigned to this case and the attorneys of record in this case.

74.     The Class includes individuals who are members of an "Ohio Subclass" defined as: "All members of the Class who made their purchases in the State of Ohio."

75.     Plaintiff does not assert claims in this action for personal injuries caused by formaldehyde exposure through the Flooring Products in question here.   Rather, Plaintiff, individually and on behalf of the other Class members, seeks solely economic and equitable relief as a result of his purchase of Lumber Liquidators' Flooring Products.

76.     The members of the Class are so numerous that joinder of all members would be impracticable. The proposed Class likely includes not less than tens of thousands of members dispersed across the United States. The precise number of Class members can be ascertained

through discovery, which will include records of Lumber Liquidators' sales, its warranty service, and other records and documents.

77.　There are common questions of law and fact that predominate over any questions affecting only individual Class members. These common legal and factual questions, include, but are not limited to:

 a.　Whether Lumber Liquidators' Flooring Products emit excessive levels of formaldehyde;

 b.　Whether the Flooring Products have also caused premature and progressive degradation of coils used in HVAC units, culminating in failure;

 c.　Whether Lumber Liquidators represented and warranted that its Flooring Products were CARB and EU compliant;

 d.　Whether Lumber Liquidators represented and warranted that its Flooring Products complied with their label descriptions;

 e.　Whether Lumber Liquidators omitted and concealed material facts from its communications and disclosures to Plaintiff and the other Class and Subclass members regarding the illegal sourcing of its Flooring Products;

 f.　Whether Lumber Liquidators has engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in connection with its marketing and sale of its Flooring Products;

 g.　Whether Lumber Liquidators breached its express or implied warranties to Plaintiff and the other Class and Subclass members with respect to its Flooring Products;

h.   Whether, as a result of Lumber Liquidators' conduct, Plaintiff and the other Class and Subclass members have suffered damages; and if so, the appropriate measure of damages to which they are entitled; and

i.   Whether, as a result of Lumber Liquidators' misconduct, Plaintiff and the other Class and Subclass members are entitled to equitable relief and/or other relief, and, if so, the nature of such relief.

78.   Plaintiff's claims are typical of the claims of the other Class and Subclass members. Plaintiff and each of the other Class and Subclass members have been injured by the same wrongful practices of Lumber Liquidators. Plaintiff's claims arise from the same practices and course of conduct that give rise to the other Class and Subclass members' claims and are based on the same legal theories.

79.   Plaintiff will fully and adequately assert and protect the interests of the other Class and Subclass members. In addition, Plaintiff has retained class counsel who are experienced and qualified in prosecuting class action cases similar to this one. Neither Plaintiff nor his attorneys have any interests contrary to or conflicting with other Class and Subclass members' interests.

80.   A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the other Class and Subclass members' claims is economically infeasible and procedurally impracticable. While the damages sustained by Class and Subclass members in the aggregate are substantial, the individual damages incurred by each Class and Subclass member are too small to warrant the expense of individual suits. The likelihood of individual Class and Subclass members prosecuting their own

separate claims is remote, and even if every Class and Subclass member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. Further, individual Class and Subclass members do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also result in varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and the court system because of multiple trials of the same factual and legal issues.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

81.    In addition, Lumber Liquidators has acted or refused to act on grounds generally applicable to the Class and Subclass, and as such final injunctive relief or corresponding declaratory relief with regard to the Class and Subclass members as a whole is appropriate.

82.    Plaintiff does not anticipate any difficulty in the management of this litigation. Any manageability concerns can be adequately addressed through various means available to the Court.

83.    Lumber Liquidators has, or has access to, address and other contact information for the Class and Subclass members, which may be used for the purpose of providing notice of the pendency of this action.

## VI. CLAIMS ALLEGED

### COUNT 1

### Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

#### (Asserted on Behalf of the Class)

84.     Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

85.     Plaintiff brings this claim individually and on behalf of the other Class members against Lumber Liquidators.

86.     Plaintiff and the other Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

87.     Lumber Liquidators is a "supplier" and "warrantor" within the meaning of 15 U.S.C. §§ 2301(4)-(5).

88.     Lumber Liquidators' flooring purchased separate from the initial construction of the structure constitutes a "consumer product" within the meaning of 15 U.S.C. § 2301(1).

89.     Lumber Liquidators' express warranties and written affirmations of fact regarding the nature of the flooring, including that the flooring was free from defects and was in compliance with CARB and EU formaldehyde standards and all other applicable laws and regulations, constitute written warranties within the meaning of 15 U.S.C. § 2301(6).

90.     Lumber Liquidators breached their warranties by:

    a.  Manufacturing, selling and/or distributing flooring that exceeds the CARB and EU formaldehyde standards;

24

      b.   Manufacturing, importing, selling and/or distributing flooring that fails to comply with all applicable laws and regulations; and

      c.   Refusing to honor the express warranty by refusing to properly repair or replace the defective flooring.

91.     Lumber Liquidators' breach of its express warranties deprived Plaintiff and the other Class members of the benefits of their bargains and/or caused damage to other property.

92.     The amount in controversy of Plaintiff's individual claims meets or exceeds the sum or value of $25.  In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

93.     As a direct and proximate result of Lumber Liquidators' breaches of its written warranties, Plaintiff and the other Class members sustained damages in an amount to be determined at trial.  Lumber Liquidators' conduct damaged Plaintiff and the other Class members, who are entitled to recover damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, rescission, and/or other relief as appropriate.

## COUNT 2

### Violation of Ohio Consumer Sales Practices Act, O.R.C. 1345.01, *et seq*.

#### (Asserted on Behalf of the Ohio Subclass)

94.     Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

95.     Plaintiff brings this claim individually and on behalf of the other Ohio Subclass members against Lumber Liquidators.

96.     The Ohio Consumer Sales Practices Act, O.R.C. § 1345.02, prohibits unfair or deceptive acts or practices in connection with a consumer transaction.  For example, the Act prohibits suppliers from representing that goods have characteristics or uses or benefits which they do not have.  The Act also prohibits suppliers from representing that their products or goods are of a particular standard, quality, or grade they are not; that the products or goods have been supplied in accordance with a previous representation, if they have not; and that the transaction involves a warranty, rights, remedies, or obligations if that representation is false.  Defendant's actions as described throughout this Complaint violate each of these provisions.

97.     The Ohio Consumer Sales Practices Act, O.R.C. § 1345.03, also prohibits unconscionable acts or practices in connection with a consumer transaction which includes the circumstances at issue here where Defendants have knowingly taken advantage of the inability of consumers reasonably to protect their interests because of the consumers' ignorance of the excessive levels of formaldehyde emitted by the Flooring Products.

98.     Defendant is a "supplier" as that term is defined in O.R.C. § 1345.01(C).

99.     Plaintiff and the members of the Ohio Subclass are "consumers" as that term is defined in O.R.C. § 1345.01(D).

100.    Lumber Liquidators misrepresented and continues to misrepresent that its goods have or had certain characteristics, are or were of a particular standard, quality, or grade, and committed and continues to commit various other acts of deception, false pretense, false promise, or misrepresentations in connection with consumer transactions, including, among other things:

      a.  Manufacturing, selling and/or distributing flooring that contains excessive levels of formaldehyde;

b. Manufacturing, selling and/or distributing flooring that exceeds the CARB and EU formaldehyde standards despite the Company's repeated statements to the contrary;

c. Manufacturing, importing, selling and/or distributing flooring that fails to comply with all applicable laws and regulations;

d. Making false and misleading statements and omitting to disclose material information regarding defects in Lumber Liquidators' flooring, including but not limited to the levels of formaldehyde emissions and compliance with CARB and EU formaldehyde standards; and

e. Refusing to properly repair or replace the defective flooring as described herein.

101. Defendant's conduct alleged above constitutes unfair, deceptive, and unconscionable acts and practices in connection with a consumer transaction in violation of O.R.C. § 1345.02 and § 1345.03.

102. Defendant's conduct as alleged above constitutes an act or practice previously declared to be deceptive or unconscionable by rule adopted under division (B)(2) of section 1345.05 and previously determined by Ohio courts to violate Ohio's Consumer Sales Practices Act and was committed after the decisions containing these determinations were made available for public inspection under division (A)(3) of O.R.C. § 1345.05. These cases included, but are not limited to: *Marks v. C.P. Chemical Co., Inc.*, No. 49943, PIF No. 10000824 (Ct. App. Cuyahoga Dec. 31, 1986); and *Hall v. Fairmont Homes, Inc.*, No. 94CA2035, PIF. No. 10001755 (Ct. App. Ross July 20, 1995).

103. Defendant's conduct caused damages to Plaintiff and the members of the Ohio Subclass as alleged herein.

104. Accordingly, Plaintiff and the members of the Ohio Subclass are entitled to recover damages and attorneys' fees pursuant to O.R.C. § 1345.09.

## COUNT 3

## Violation of Ohio Deceptive Trade Practices Act

### (Asserted on Behalf of Ohio Subclass)

105. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint.

106. Defendant's conduct as alleged herein violated Ohio's Deceptive Trade Practices Act. More specifically, by falsely representing during all relevant time periods that the Flooring Products comply with formaldehyde standards, Defendant violated O.R.C. §§ 4165.02 (A)(1) ("[p]asses off goods or services as those of another"); 4165.02(A)(2) ("[c]auses likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or service"); 4165.02(A)(7) ("[r]epresents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"); 4165.02(A)(9) ("[r]epresents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another"); and 4165.02(A)(11) ("[a]dvertises goods or services with intent not to sell them as advertised").

107. Such representations, individually and collectively, were made by Defendant in the course of its business, and in violation of O.R.C. § 4165.02, in that Defendant represented that the Flooring Products have characteristics benefits and qualities that they do not have.

108. By making such representations, individually and collectively, Defendant willfully engaged in a deceptive trade practices listed in O.R.C. § 4165.02, knowing them to be deceptive.

109. Plaintiff and the Ohio Subclass have been injured as a direct and proximate result of Defendant's violation of O.R.C. § 4165.02, and were damaged in an amount that will be proven at trial.

## COUNT 4

### Breach of Express Warranty

**(Asserted on Behalf of Ohio Subclass)**

110. Plaintiff incorporates by reference the foregoing paragraphs of this Complaint.

111. Plaintiff brings this claim individually and on behalf of the other Ohio Subclass members against Lumber Liquidators.

112. Lumber Liquidators warranted that its flooring was free of defects when it sold those products to Plaintiff and the members of the Ohio Subclass as described in this Complaint. Defendant further represented that its flooring products complied with CARB and EU formaldehyde standards and all applicable laws and regulations.

113. Lumber Liquidators' warranties became part of the basis of the bargain as Plaintiff and the Subclass would not have purchased the Flooring Products, or would have purchased them at a significant discount, had they known the truth about Defendant's representations in the previous paragraph.

114. Lumber Liquidators breached its warranties by:

a. Manufacturing, selling and/or distributing flooring that exceeds the CARB and EU formaldehyde standards;

b. Manufacturing, importing, selling and/or distributing flooring that fails to comply with all applicable laws and regulations; and

c. Refusing to honor the express warranty by refusing to properly repair or replace the defective flooring.

115. Lumber Liquidators was on notice regarding the excessively high levels of formaldehyde in its flooring from complaints and requests for refund it received from Class members, Internet message boards, published product reviews, prior litigation and media reports.

116. As a direct and proximate result of Lumber Liquidators' misconduct, Plaintiff and the other Ohio Subclass members have suffered damages and continue to suffer damages, including economic damages at the point of sale and/or damage to other property after installation. Additionally, Plaintiff and the other Ohio Subclass members have either incurred or will incur economic damages at the point of repair in the form of the cost of repair and/or the cost of purchasing non-defective flooring to replace the Lumber Liquidators' flooring and the cost of repair and/or the cost of purchasing new HVAC systems for the damage caused to them by the Flooring Products.

117. Plaintiff and the other Ohio Subclass members are entitled to legal and equitable relief against Lumber Liquidators, including damages, consequential damages, specific performance, rescission, attorneys' fees, costs of suit, and other relief as appropriate.

<u>**COUNT 5**</u>

<u>**Breach of Implied Warranty in Tort  (O.R.C. § 1302.27 and Common Law)**</u>

**(Asserted on Behalf of Ohio Subclass)**

118.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

119.    Plaintiff brings this claim individually and on behalf of the other Ohio Subclass members against Lumber Liquidators.

120.    Defendant is and was at all relevant times a merchant with respect to the Flooring Products.

121.    A warranty that the Flooring Products were in merchantable quality and condition is implied by law pursuant to O.R.C. § 1302.27 and Ohio common law.

122.    Defendant impliedly warranted that the Flooring Products were of good and merchantable condition and quality – fit and safe for their ordinary intended use.

123.    The Flooring Products were defective at the time they left the possession of Defendant.  These defects include the Flooring Products' excessive formaldehyde emissions. Defendant knew of these defects at the time these transactions occurred.  Thus, the Flooring Products, when sold and at all times thereafter, were not in merchantable condition or quality and are not fit for their ordinary intended purpose.

124.    Additionally, at all times relevant hereto, there was a duty imposed by law requiring manufacturers or sellers to conform their products to the promises or affirmations of fact made on the container or label.

125. In designing, packaging, marketing, distributing, and/or selling the Flooring Products, Defendant warranted that the Flooring Products were in compliance with CARB standards.

126. Defendant breached this duty by, *inter alia*, selling flooring to Plaintiff and the other members of the Ohio Subclass that was not adequately labeled and containing false affirmations of fact on the container or label concerning compliance with CARB standards.

127. Defendant further breached the warranty implied in the contract for the sale of the Flooring Products because the Flooring Products could not pass without objection in the trade under the label description, the goods were not of fair average quantity within the description, and the goods were unfit for their intended and ordinary purpose. Accordingly, Plaintiff and the Subclass members did not receive goods as impliedly warranted by Defendants to be merchantable.

128. Plaintiff and the Subclass members purchased the Flooring Products in reliance upon Defendant's skill and judgment and the implied warranties of fitness for their intended and ordinary purpose.

129. The Flooring Products were not altered by the Plaintiff or the Subclass members.

130. The Flooring Products were defective when they left the exclusive control of Defendant.

131. Defendant knew that the Flooring Products would be purchased and consumed without additional testing by Plaintiff and Subclass members.

132. The Flooring Products were defectively designed and unfit for their intended purpose, and Plaintiff and the Subclass members did not receive the goods as warranted.

133.     As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiff and Subclass members have been injured and harmed because (i) they would not have purchased the Flooring Products on the same terms if they had known the products' true contents; (ii) they paid a price premium for the Flooring Products based on Defendant's representations; and (iii) the Flooring Products did not have the characteristics, ingredients, uses, benefits, or quantities promised.

134.     Defendant was notified that its product was not merchantable within a reasonable time after the defect manifested itself to Plaintiff and the members of the Ohio Subclass.

135.     As a result of the non-merchantability of Lumber Liquidators' flooring described herein, Plaintiff and other members of the Ohio Subclass sustained a loss or damages.

## COUNT 6

### Negligent Design/Engineering/Manufacturing

### (Asserted on Behalf of Ohio Subclass)

136.     Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

137.     Plaintiff brings this claim individually and on behalf of the other Ohio Subclass members against Lumber Liquidators

138.     Lumber Liquidators selected the materials to be used in the Flooring Products installed in the homes of Plaintiff and the Subclass members.

139.     Defendant owed Plaintiff and the Ohio Subclass a non-delegable duty to exercise ordinary and reasonable care to properly design, engineer, and manufacture the Flooring Products against foreseeable hazards and malfunctions.

140.    The design of the Flooring Products, including the formulation of the materials used, was defective and because of such design defects, the Flooring Products are unreasonably dangerous to the consuming public, including Plaintiff and the Subclass members.  The Flooring Products posed a substantial likelihood of harm at the time they were sold.

141.    The defect in the design of the Flooring Products existed at the time the Flooring Products left Lumber Liquidators' possession, custody, or control and was sold.

142.    The risks inherent in the design of the Flooring Products outweigh the benefits of their design.

143.    Feasible alternatives existed to make the Flooring Products safer for their intended use at the time of design.

144.    The Flooring Products were expected to be and were installed in consumers' homes, including Plaintiff's home, without substantial change in condition from the time of manufacture or sale.

145.    Defendant did not design, engineer, or manufacture the Flooring Products with reasonable care.

146.    As to Defendant's manufacture of the Flooring Products, the Flooring Products differed in a material way from Defendant's design specifications

147.    Lumber Liquidators is strictly liable for the injuries that the defective Flooring Products have caused the Plaintiff and the Ohio Subclass.

148.    The injuries caused to Plaintiff and Subclass members as a result of the defective Flooring Products could and should have been reasonably foreseen by Lumber Liquidators.

149.     As a proximate result of the defective Flooring Products, Plaintiff and Subclass members have incurred and will incur damages in an amount to be proven at trial.

## COUNT 7

### Strict Liability – Failure to Warn

**(Asserted on Behalf of Ohio Subclass)**

150.     Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

151.     Plaintiff brings this claim individually and on behalf of the other Ohio Subclass members against Lumber Liquidators.

152.     Lumber Liquidators designed the Flooring Products by selecting the materials to be used in the Flooring Products, which were installed in the homes of Plaintiff and Subclass members.

153.     When the Plaintiff and Ohio Subclass members bought the Flooring Products, they were not aware of their dangerous and destructive nature and Lumber Liquidators knew or had reason to know that the consumers would not realize the dangerous condition of the Flooring Products.

154.     Lumber Liquidators did not provide, and the Flooring Products did not contain adequate warnings concerning formaldehyde and, in fact, Defendant represented that the Flooring Products met the highest standards. As a result, the Flooring Products were unreasonably dangerous to the consuming public, including Plaintiff and the Subclass members.

155. The defect in the Flooring Products, including the lack of warnings, existed at the time the Flooring Products were sold and/or when the Flooring Products left Lumber Liquidators' possession, custody, or control.

156. The Flooring Products were expected to be and were installed in consumers' homes, including Plaintiff's home, without substantial change in its condition from the time of their manufacture or sale.

157. Lumber Liquidators is strictly liable for the damages and losses that its defective Flooring Products, and lack of warnings, have caused Plaintiff and the Ohio Subclass members. Such harm would not have been suffered if Lumber Liquidators had provided adequate warnings.

158. The damages and losses caused to Plaintiff and the Ohio Subclass members as a result of the defective Flooring Products could and should have been reasonably foreseen by Lumber Liquidators.

159. As a proximate result of Lumber Liquidators' failure to give adequate warnings or instructions regarding any reasonably foreseeable problems, Plaintiff and the Ohio Subclass members have incurred and will incur damages in an amount to be proven at trial.

## COUNT 8

### Negligence

**(Asserted On Behalf of Ohio Subclass)**

160. Plaintiff realleges and incorporates by reference each of the paragraphs above.

161. Plaintiff brings this claim individually and on behalf of the other Ohio Subclass members against Lumber Liquidators.

162.    Lumber Liquidators designed, imported, labeled, advertised and sold the Flooring Products.

163.    The Flooring Products are unreasonably dangerous because of the excess levels of formaldehyde.

164.    Lumber Liquidators owed a duty to the consuming public to design and import a product reasonably free of defect.  Defendant further had a duty not to put defective and dangerous products such as its Flooring Products on the market.

165.    At the time Lumber Liquidators was selling the Flooring Products, Lumber Liquidators was aware, or reasonably should have been aware, of the foreseeable risks associated with the use of the Flooring Products.

166.    Defendant was negligent and breached its duty to the consuming public, including the Plaintiff and Ohio Subclass members, by designing, importing, and selling Flooring Products with excessive levels of formaldehyde, which can cause damage to other property including corrosion of coils in HVAC systems.

167.    The damages and losses sustained by Plaintiff and Ohio Subclass members could have been reasonably foreseen by Lumber Liquidators.

168.    As a direct and proximate result of Lumber Liquidators' negligent acts and/or omissions, Plaintiff and the Ohio Subclass members have incurred and will incur damages in an amount to be proven at trial.

## COUNT 9

### Fraud

**(On Behalf Of Ohio Subclass)**

169.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

170.    Plaintiff brings this claim individually and on behalf of the other Ohio Subclass members against Lumber Liquidators.

171.    Defendant was in a position of superiority over Plaintiff and Ohio Subclass members with respect to knowledge of the unacceptably high formaldehyde levels in the Flooring Products, which it failed to disclose to Plaintiff and the other Ohio Subclass members.

172.    Defendant affirmatively misled by representing that its Flooring Products met the highest standards for formaldehyde compliance, including CARB standards.

173.    At all relevant times, Lumber Liquidators continuously and consistently failed to correct its misrepresentations concerning the formaldehyde levels in its Flooring Products. Defendant's failure persisted despite countless opportunities to correct its representations through its employees, sales literature, advertising, and its website.

174.    Plaintiff and the Ohio Subclass members would not have purchased the Flooring Products, or would have purchased them at a significant discount, had they known the truth about Defendant's wrongful acts and omissions described in the previous paragraph.

175.    Lumber Liquidators failed to disclose material facts and correct material misrepresentations, and, as a proximate result, Plaintiff and the Ohio Subclass members have been damaged because they purchased defective Flooring Products that can cause damage to other property.

## COUNT 10

### Unjust Enrichment

### (Asserted on Behalf of Ohio Subclass)

176.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

177.    Plaintiff brings this claim individually and on behalf of the other Ohio Subclass members against Lumber Liquidators.

178.    Defendant had knowledge of the warranty defects in the Flooring Products, which it failed to disclose to Plaintiff and the other Ohio Subclass members.

179.    As a result of its wrongful acts and omissions, as set forth above, pertaining to the warranty misrepresentations of the Flooring Products and the concealment of the warranty misrepresentations, Lumber Liquidators charged a higher price for the Flooring Products than the true value of the Flooring Products, and Lumber Liquidators thereby obtained monies that rightfully belong to Plaintiff and the other Ohio Subclass members, allowing Lumber Liquidators to receive a benefit from Plaintiff and the other Ohio Subclass members.

180.    Lumber Liquidators realized this benefit from Plaintiff and the other Ohio Subclass members, and accepted and retained the non-gratuitous benefits conferred by Plaintiff and the other Ohio Subclass members, who without knowledge of the warranty defects, paid a higher price for Flooring Products than they were truly worth.  Plaintiff and the other Ohio Subclass members did not confer these benefits officiously or gratuitously, and it would be inequitable and unjust for Lumber Liquidators to retain these wrongfully obtained profits.

181. Plaintiff and the other Ohio Subclass members are therefore entitled to restitution in an amount to be determined at trial.

## VII.  DAMAGES AND OTHER RELIEF

182. Lumber Liquidators' acts and omissions were a proximate cause of the damages to Plaintiff and the members of the Class and Ohio Subclass.  Class and Subclass members have sustained financial losses associated with their purchase of Lumber Liquidators' flooring as they failed to obtain the benefit of their bargain, would not have purchased the products, and/or would have paid less for them if they had known the truth.  Other financial damages include installation and removal costs, remediation costs, restocking fees, loss of use, diminished value, and other losses.  At this time, Plaintiff seeks damages individually and on behalf of the other Class and Subclass members and equitable relief as previously alleged in this Complaint.

183. Plaintiff, individually and on behalf of the other Class and Subclass members, seeks reasonable and necessary attorneys' fees and costs incurred in connection with this suit.

184. Plaintiff, individually and on behalf of the other Class and Subclass members, seeks pre-judgment and post-judgment interest, at the highest rates allowed by law, on the damages awarded.

## VIII.  REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other Class and Subclass members, respectfully requests that the Court enter judgment in their favor as follows:

   a. certifying the Class and Ohio Subclass and appointing Plaintiff and his counsel to represent the Class and Ohio Subclass;

   b. declaring that Lumber Liquidators is financially responsible for notifying all Class and Subclass members about the defects described herein;

c.  enjoining Lumber Liquidators from further deceptive sales practices with respect to the Company's flooring;

d.  awarding Plaintiff and the other members of the Class and Subclass their actual damages, consequential damages, specific performance, restitution, rescission, and/or treble damages, where appropriate;

e.  directing Lumber Liquidators to repair and/or replace all defective and/or misbranded flooring at no cost to the Class and Subclass members;

f.  awarding Plaintiff and the other Class and Subclass members pre-judgment and post-judgment interest;

g.  awarding Plaintiff and the other Class and Subclass members reasonable attorneys' fees and costs of suit, including expert witness fees;

h.  awarding Plaintiff and the other Class and Subclass members punitive damages, where authorized;

i.  granting leave to amend the Complaint to conform to the evidence produced through discovery and/or at trial; and

j.  awarding such other and further relief as this Court may deem just and proper.

## IX.  DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.

Dated:  March 13, 2015

Respectfully submitted,

By:  *s/Jeffrey S. Goldenberg*
Jeffrey S. Goldenberg (#0063771)
Todd B. Naylor (#0068388)
Robert B. Sherwood (#0084363)
**GOLDENBERG SCHNEIDER, LPA**
One West Fourth Street, 18th Floor
Cincinnati, OH 45202
Telephone: (513) 345-8291
Facsimile: (513) 345-8294
E-mail: jgoldenberg@gs-legal.com
tnaylor@gs-legal.com
rsherwood@gs-legal.com

Daniel R. Karon (#0069304)
Beau D. Hollowell (#80704)
**KARON LLC**
700 W. St. Clair Ave., Ste. 200
Cleveland, OH 44113
Telephone: (216) 622-1851
Facsimile: (216) 241-8175
E-mail: dkaron@karonllc.com
bhollowell@karonllc.com

Vincent J. Esades
James W. Anderson
**HEINS MILLS & OLSON, P.L.C.**
310 Clifton Ave.
Minneapolis, MN 55403
Telephone: (612) 338-4605
Facsimile: (612) 338-4692
E-mail: vesades@heinsmills.com
janderson@heinsmills.com

Jason S. Hartley
**STUEVE SIEGEL HANSON, LLP**
550 West C Street, Suite 1750
San Diego, CA 92101
Telephone: (619) 400-5822
E-mail: hartley@steuvesiegel.com

Douglas A. Millen
**FREED KANNER LONDON & MILLEN, LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015 USA
Telephone: (224) 632-4500
Facsimile: (224) 632-4521
E-mail: dmillen@fklmlaw.com

Robert J. Gralewski, Jr.
**KIRBY McINERNEY, LLP**
600 B Street, Suite 1900
San Diego, CA  92101
Telephone: (619) 398-4340
E-mail: bgralewski@kmllp.com

Gary E. Mason
Daniel K. Bryson
Jason S. Rathod
**WHITFIELD BRYSON & MASON LLP**
1625 Massachusetts Ave., NW, Suite 605
Washington, D.C.  20036
Telephone:  (202) 429-2290
Facsimile:  (202) 429-2294
E-mail: gmason@wbmllp.com
dbryson@wbmllp.com
jrathod@wbmllp.com

Andrew J. McGuinness
**ANDREW J. McGUINNESS, ESQ.**
122 S Main St., Suite 118
P.O. Box 7711
Ann Arbor, MI 48107
Telephone: (734) 274-9374
Facsimile: (734) 786-9935
E-mail: drewmcg@topclasslaw.com

***Attorneys for Plaintiff and the Proposed Class***

43